Case number 22-1251, Public Citizen, Inc. Petitioner for the Federal Energy Regulatory Commission. Mr. Joshi for the Petitioner, Mr. Glover for the Respondent, Ms. Key for the Intervener. Joshi, good morning. Good morning. May it please the Court. This case challenges a pair of orders from the Federal Energy Regulatory Commission in which the Commission concluded that it does not have jurisdiction over export facilities that deliver liquefied natural gas to ships by truck. That decision was wrong. Congress gave the Commission exclusive jurisdiction over all natural gas export facilities located on shore or in state waters. The only export facilities excluded from the Commission's jurisdiction are deep water ports, which Congress expressly carved out from the scope of the Natural Gas Act. In the Commission's view, however, onshore in the Natural Gas Act does not mean on land, the way it does in every other oil and gas statute. But if onshore doesn't mean on land, the Commission never coherently explains what else it could mean. It cannot mean near the coast, because even the Commission agrees that it would be arbitrary to regulate export facilities differently based on their distance from the coastline. But the statutory text allows for no other options. It must mean on land. What the Commission has done instead is to say that onshore doesn't refer to a facility's physical location at all, but to the way gas is transferred from two ships for export. If by pipeline, the facilities are on shore. If by truck, they are inland facilities that fall under the state's authority. Congress, however, did not write the statute that way, and this Court should not read it that way. Onshore refers to a facility's physical location, and history and context make clear that that physical location is a location on land. Let's just start with the word onshore. This case is a little unusual. Usually, parties throw dictionary definitions at us, and each side is saying the text is crystal clear the way we want to read it. Here, there's actually agreement on both sides that the word is ambiguous. Onshore can mean at the coastline, or it can mean anywhere on land, right? So I would take issue that we just started with onshore. The dictionaries say what they say, and they set out the universe, I think, of what the Commission can use to determine what the meaning of onshore is. However, I think everyone agrees at this point, onshore really can't mean near the coast in terms of a distance measurement because that would result in utterly arbitrary decision-making. A facility, a liquefaction facility, one mile from the coast may be in, two miles from the coast may be out, Commission does not carve up the world that way. It regulates facilities hundreds of miles inland. Put aside your arbitrary and capricious point, and just in terms of what the words can mean, at or near the coastline is a perfectly accepted, coherent meaning of the word onshore. In the abstract, I think that's right. In the context and history of the National Gas Act, I don't think that's right. Historically, Section 3 of the Act gave the Commission jurisdiction over facilities as derived from Section 3's regulation of imports and exports, the activities themselves. That's what this Court held in District Gas. Even if facilities are located entirely in one state, which are normally carved out from the Commission's facilities, they are all within the Commission's jurisdiction. That was Border Pipeline from 1949. That was District Gas. That was the backdrop on which Congress acted in 2002 when it carved out deep water facilities. Then three years later, when it enacted this definition, Commission officials testified to Congress, this is the way the world is carved up. Deep water facilities are subject to the Department of Transportation's jurisdiction under the Deep Water Port Act and basically other import or export facilities. At the time, it was import primarily, but they are subject to the Commission's jurisdiction historically. If we move from text to structure and context, which we all agree, we do that as part of Chevron Step 1. The context is there are three categories of facilities. There are the ones that are in the deep water, there are the ones that are in, I'll just call it the shallow water, the water that's within state jurisdiction, and there are the facilities that are onshore, whatever that means. Doesn't the water-based focus of that scheme suggest that onshore means at the shoreline? Say, I might be in deep water, I might be in shallow water, I might be onshore. That doesn't mean I might be in Nebraska. I don't see that connection. I think Congress was primarily concerned with exports and imports by ship. The words they used in the definition suggest that was its focus. But the Commission, for example, doesn't say there's only certain facilities in state waters or subject to jurisdiction, state waters or state waters. I think the same is true with onshore. I think, to go to your question, it gets back to the arbitrariness of setting a distance measurement from the shoreline. Nebraska is too far, but maybe Louisiana, central Louisiana is close enough. I don't think anyone thinks that's a I think if what you're suggesting is correct, Congress in 2005 meant for the first time to take facilities used for foreign commerce and natural gas and give them to the states to regulate the ban, to determine whether they get built or how they get built. That's exactly the opposite purpose Congress had in 2005, which was to preempt the states. In that situation, California was contesting the Commission's jurisdiction. So the words of the statute really talk about the function of the facility. The words onshore or in state waters are to make clear that the Commission's jurisdiction not extended to port of ports. I think one other contextual clue here might be, and just keeping in mind that I think it unambiguously has your meaning, again, putting aside the arbitrary and capricious challenge. In addition to what Judge Katz's points to, the statute also references transported in interstate commerce by waterborne vessel. Isn't that another indication that we're focused on water, the shore? It doesn't say transported in interstate commerce by any means. Well, traditionally, the Commission had jurisdiction over interstate commerce under Section 7. And under Section 7, historically, it has read the different wording of that provision to exclude non-pipeline transport. So what Congress didn't want to enact in Section 3 was not only strengthen the Commission's jurisdiction over imports and exports, for example, by amending Section 1, but also to expand Section 3 to include this sort of thing. The Commission had not historically regulated under Section 7. And once again, Congress may have been concerned with exports by ship, but not whether the facilities themselves were located at this shoreline. Most facilities are, because if you're going to export or import by ship, you're going to want to be near the shoreline for cost reasons. But whether the jurisdictional analysis, whether the Commission or the states should regulate a particular facility, it doesn't coherently make sense in terms of a distance measurement. In fact, the Commission does not adopt the distance measurement at all. It says we won't do that. What we're going to look at is method of delivery of gas to the ship. I think that's a red flag that the Commission cannot come up with a coherent interpretation of onshore. That means near the to provide some type of alternative regulatory scheme that it can apply to different areas. How are you asking us to think about this? You're addressing now your challenge to the direct transfer test, essentially. Are you asking us to think about that as essentially an arbitrary and capricious issue? Or is it a statutory interpretation issue? So I think it's more of a statutory interpretation issue. We don't ask the Commission to determine what we think the facility would be close enough if there were distance measurement. It's pretty close, a quarter mile from the coast. But ultimately, it's the Commission that has to decide that. The Court disagrees with us that onshore means on land unambiguously. The Court should conclude that the Commission's interpretation that treats onshore as a method of delivery as opposed to a geographic area is not a plausible demand. So the Commission can come up with a distance measurement if it sticks to that interpretation. In your rehearing petition, really focused on the argument that onshore means anywhere on land. And then you maybe have a fallback. You have a somewhat cursory rhetorical line that if the precedents require a more direct capability of transferring LNG than the quarter mile. That's a statutory argument. That's not an arbitrary and capricious argument. I think our focus both for the Commission and here is a statutory one. I think that probably entitles you to make a statutory argument that the direct connection test can't be reconciled with the statute. The onshore as used in the statute construed in context. I'm not sure it entitles you to make an argument that assuming that's a permissible statutory construction, the Commission didn't adequately explain it. Right. I don't think we make a lack of reason to explanation. You don't think you make the latter. It's sort of trying to smuggle it in when you say that onshore can't mean on or near the shore because the Commission says it would be arbitrary to determine onshoreness by just an absolute amount of distance. So let me be clear. Our primary argument for the Commission here is onshore means on land. So if the court disagrees with that and reaches the second argument, we don't think the Commission's alternative interpretation of onshore where it says it would satisfy Chevron's second step. Now, the court has set the Chevron's second step analysis similar to an arbitrary analysis. So in that sense, you can say it's an arbitrary challenge. But we don't contend that this court should decide that the Commission has determined that 0.25, I mean, a quarter mile is too close or not close enough. The Commission did not engage in that analysis because it substituted geography for a completely different standard that looks to method of delivery. And so in that sense, even if the court were to give the Commission deference, they really didn't exercise that deference in any sort of way that the statutory text would permit. Well, why is your primary argument the onshore argument as opposed to the argument about the FERC says that LNG terminals must be capable of transferring LNG onto waterborne vessels? And where's the statutory support for that? I don't understand why this wouldn't be your primary argument when it's so much, I think, stronger to show that this is not consistent with the statutory text structure context 10. Well, we focus on the meaning of that argument. We think that clears up a lot of confusion. I do think we make that second argument that you do. I'm just wondering about the emphasis. Yes. No, I think it's I think if the court were not to conclude in this case, onshore means on land or may face these questions over and over again. So it could be just move further back if the Commission has to come up with a distance measure. Do you have a sense of how many facilities we're talking about? Like, is this proliferating? It appears that this is a kind of new technology, at least since 2015. So when the statute was written, this type of facility was not in use. And so it's a novel technology. And how many facilities are we talking about? If you have a sense of order of magnitude that you're saying should be regulating, but it is not. So for export import facilities, I want to say they're in the 20 to 25 range. Maybe the Commission would have a better number. And most of those, at least by volume, I shouldn't say most, but in terms of by volume, most of those will be the types of facilities that the Commission says it can regulate, which are delivering directly transferring liquefied natural gas to ship. My question was about the ones that are putting the LNG into containers that are then trucked to the port. That's a little harder to determine because the Commission has not regulated them. So we only know about them because of these declaratory rulings. They're having too many recently. The other thing that makes it difficult, and maybe the Commission has statistics, but you can have these facilities that operate domestically. And so they could be located anywhere. And so I don't have a precise number. My understanding is if an LNG facility loads liquid gas into the container and then puts it on the truck, that's what we're talking about. If the truck then just drives across the border, FERC's position is that the truck is not an export facility. Do you disagree with that? So I guess we don't disagree or agree because FERC says that, but it has not pointed to a prior Commission order that undertakes the analysis. And we haven't been able to find that ourselves. So it's sort of a suggestion that it's not backed by anything. Since those do not involve ships, perhaps... Well, I mean, we're figuring out the consequences of your theory. Right. And I don't think those facilities are very numerous, but it's a little hard to argue in the abstract one way or the other to differentiate or not differentiate that situation because I have not seen any analysis by FERC explaining why, for example, those exporters need an export license for the Department of Energy, why those facilities are excluded if they are. So it's a little hard to sort of differentiate that. We have here a definition that Congress enacted, obviously, that we sink our teeth into and interpret. We don't have anything commissionable about the truck transport. I mean, if you accept that the truck driving the natural gas across the border is not an export facility and FERC says this facility is sort of like that, right? Once the gas is put on the truck, that's the facility. The truck leaves and it might be destined for a ship. It might be destined for the border. That's kind of downstream from the facility. Well, I don't think it said that in this order. And if it had, we might have... Well, it said that in Pivotal. Pivotal, yes. Well, Pivotal involved a situation where the facility was putting LNG into containers and then its customers were either going to be people who... Entities that exported the gas. So it did say that. I think it mentioned that in Shell. It did not rely on that reasoning here. But once again, neither of those orders cite any prior commission order that talks about truck... So... I guess I'm wondering, it might have something to do with FERC's idea that pipelines are different. It might have something to do with FERC's idea that dedicated facilities are different. So those are... And you're saying, don't worry, our theory won't upset the apple cart too much because those are guardrails in place and we're not challenging them. But I guess I'm wondering if your theory will put all of that in doubt. Well, I wouldn't say that necessarily. It might. I mean, FERC still has to follow the statute. FERC does... I'm aware FERC has a history, as I mentioned earlier, of construing Section 7 because of the particular language that Section 7 uses regarding interstate truck... Commerce in natural gas. So that only regulates pipelines. It does not regulate interstate truck delivery of energy. But that, A, that was a longstanding interpretation by Federal Power Commission from 1973. So that was regulatory backdrop that Congress would not... I don't think has ever applied to, until recently, has ever applied to exports or imports. Yeah, I didn't go back and read Shell directly, but as we described it in New Fortress, it treated that aspect of Section 7 and that aspect of Section 3. And FERC found in this case that this facility does satisfy the three-part test. It's not before the court because of that. So to the extent FERC is concerned about pipelines, pipeline focus, it has an element in its three-part test that looks at that, and this facility satisfies that element. So the question then is the second element of the three-part test, which is what geographic area does FERC have jurisdiction over and what geographic area does Congress have jurisdiction over? And our position is Congress intended to give FERC federal jurisdiction over facilities in Carlson where they're located, except for Deepwater. Just briefly, this case has the odd feature that we've been talking about. A facility the company says it doesn't plan to build. And on mootness, one of the main concerns you express in your brief is essentially that if we were to conclude the case is moot, then maybe Nopetro would change course and you would then be time barred from challenging these orders again. But we, of course, have the authority, if we believe the case was moot, to vacate those orders. So wouldn't that address whatever lingering concern you have about this facility? No, we addressed it in our brief. The court certainly should, if it finds the case moot, to vacate the orders. But FERC's policy at this point is pretty clear. As long as Nopetro uses trucks, they are not going to be subject to FERC's jurisdiction. And so they don't have to go back to get another declaratory ruling. They may be running a pretty significant risk that FERC would change course or that you all would go and file another petition somehow to bring it in front of FERC and secure a review. I mean, that's why they come and get a declaratory order in the first place, right? I'm sure they wanted the certainty that declaratory ruling provides. But having received the declaratory ruling, FERC's setting out its position, the fact that the court has on paper vacated the order does not change FERC's policy. And I don't know that Nopetro would have much risk of a FERC enforcement action, especially given that FERC is saying this is a longstanding policy that we've consistently applied to other facilities. FERC to then change its position to Nopetro's detriment on its own, I think, would be very odd. That's what happened in District S. It does happen. That was a long time ago. And New Fortress, I believe. Yeah. But in terms of the mootness standard, the courts are pretty watchful that plaintiffs or petitioners do receive the relief they ask for. And then if they're going to dismiss the cases, it's really absolutely clear that they won't be harmed by a change in voluntary action later down the road. I think that all of the cases decidedly fall to the standard. Okay. Thank you. Thank you. We'll give you rebuttal. May it please the Court. I'm Matthew Glover, and I represent and respond to the Federal Energy Regulatory Commission. I think I'll start with some of the questions you had for opposing counsel as to the interpretation of onshore. Why don't you start with mootness? It's jurisdictional. Yeah. We asked you for views on whether this case was moot, and you gave us precious little. Fair. Unfortunately, I think this is one of those circumstances I learned early in my time in government, where sometimes the government isn't taking a firm position on something, and it may be disappointing to the court. But I have a couple points. We have to deal with it. What is the Commission's position? So, we don't have a definitive position on whether this is moot, but a couple of points in response. First of all, we've said repeatedly that these are case-by-case determinations when we issue these jurisdictional determinations. I think it's footnote 12 at page 43. We made clear to Petro that this is only as to the project specified here in the declaratory order. And I think at footnote 33, we also note that if you had a different facility that was loading LNG pieces onto trucks, but you were loading it at a dedicated LNG facility, we're not addressing that here. So, this is going to be very limited to what Petro is doing. We weren't clear from their letter. Their interest in kind of the precedential value, I don't think, could keep this case not being moot. So, it becomes a question of how likely are they to construct this facility, no Petro themselves. I think as petitioners pointed out in their supplemental brief, in cases where we issue a certificate, we had one of those called Jordan Cove. What we did when the petitioner no longer sought to build that facility, we actually asked the court for jurisdiction back because we'd filed the administrative record. And then we asked the party, shall we vacate the certificate? They said we should. We vacated the certificate. We came back to the court and said, you should dismiss. As they point out, this is not a scenario where we issued a certificate. We've made a declaratory statement as to this specific facility. And the ongoing policy concern, I don't think they can sustain that. I mean, Del Monte Fresh, a case from this circuit talking about when you seek a declaratory order challenging an ongoing policy, you need standing to challenge that ongoing policy. All of their standing declarations are about people in Port St. Joe about this specific facility. So, you know, and I apologize if we had more clarity from no Petro saying. No, I understand that. On the case by case, you say at points in your order that these jurisdictional determinations are made on their facts, but that's really not your reasoning. I mean, when the rubber meets the road, what you say is onshore means on or close to the shoreline and on or close to the directly connecting to the tanker. And that's a pretty clear rule of law. And unless you change your mind, it will govern a large swath of future cases. You know, I've said the decision has to be the controversy has to be predictably repeatable. It seems like this one will be when and if they try to construct something. I think I would just have two points on that. Yes, we've said and we do believe here we were following our previous precedents. But when we're issuing a declaratory order, it's an informal adjudication as to that those parties and those facts. And so I'm not disputing that, you know, in the next case, you know, if no Petro decided to try a different facility, a different facility filed a new section three petition, you know, the presumption would be the commission would continue applying the same three criteria. It's been applying the commission, obviously, given that our interpretation is ambiguous, and we've picked the best interpretation, but we haven't stated this is the only interpretation or this is sort of the only required aspect of the statute. We've left ourselves room that a future commission could change its position. In that sense, you know, you're sort of like challenging a court precedent. You know, you're asking for a declaration that that precedent is no longer good or that it wouldn't be applied in the next case. Except, you know, we don't have the LaShawn versus Barry that you're faced with where you need an iron's footnote to change your precedent. We are an agency. As to the remedy in mootness, I think Northern California Power Agency versus Nuclear Regulatory Commission confronted a situation where a party other than the petitioner, it was a petition for review from the Nuclear Regulatory Commission, a party other than the petitioner caused the case to become moot through a bankruptcy agreement. And the court said, you know, in that case, the normal remedy is vacator. If you were to vacate these orders, you know, Petro would be proceeding at their own risk given that they wouldn't have an order as to this facility. And in terms of the precedential value for any future facility, again, you know, you could take the New Fortress approach. New Fortress did not seek a declaratory order. They started construction on their facility. We issued them a show cause saying, gee, this seems to look like a jurisdictional facility. Suppose we vacate the order on mootness grounds, Petro changes course, they decide to take their chances and they start building the facility. Would a public citizen have any means of securing judicial review at that point? I think they could ask, I should have checked once more this morning because I looked last week at our declaratory order regulation. I think they could ask for a uncertainty. That's one of our grounds for a declaratory order. I think if it was the same facility in the same place, they would have the same members. They would have, you know, standing. Would you have to adjudicate that or is that discretionary? It is discretionary for us to adjudicate that. Sometimes we dismiss them. Even when we dismiss them, parties take the rehearing provision in the, at least in the Federal Power Act is where I'm more familiar with it, but it's interpreted the same as the Natural Gas Act would allow them to, you know, ask for dismissal if we said we're not going to address this again. They could ask for a hearing and then they could come to this court and say, gee, they wouldn't give us a declaratory order. We think that this is, you know, I guess that's like in terms of the cases they cite like Sands and Knox on mootness, a lot of that turned on the specific facts as to ongoing injury or potential for injury. We, you know, we just weren't sure when Petro made their statement, it wasn't a statement that we might want to pursue this facility. It had a lot of, we might want to use other facilities. We don't think this declaratory order would cover. I'll take a drink and let's go to the merits. As the court was explaining with my friend on the other side, you know, on the merits, we think the statute is ambiguous. We think we have the best reading of the statute, certainly not the only reading of the statute. In terms of onshore, we do think that onshore and state waters, transporter and interstate commerce, and then also the heading of the new provision, section 2, section 11, or 2 subsection 11, being an LNG terminal. As we explained in the order, I think it's a footnote, the hearing order footnote 31 at JA66 cites some earlier commission orders. We cited a number of those and others at page 27 of our brief. LNG terminal or a terminal was typically a large port or was used in parlance prior to the 2005 act. Let me ask you about that history. Your theory is LNG terminal had acquired an almost term apart status. Public citizen has a striking, and I'm just wondering how much of this is anachronistic because they say that when the intervening statutes were enacted, there was only one export facility. It was in Alaska, and I assume it's like what you have in mind here. It's a coastal facility that can directly load a specialized tanker. Is that accurate as to export? The U.S. was doing a lot of importing at the time. Where do we get this established practice? I can narrow or clarify. At the time of the statute, there was one LNG terminal or terminal that was a coastal facility in Alaska. There was, I think, imports. There may have also been exports on the border, and we note that we've exercised jurisdiction over the border portion under section 3 of cross-border pipelines. There was also potentially transfer of trucking or trains. We weren't going to exercise authority over that. I can cite a couple orders that were actually prior to the statute. If you look, this is about the Bahamas facility. At paragraph 39 of the declaratory order, we cite a Calypso or tractable Calypso, which was about a facility in the Bahamas. We were going to regulate under section 3 the portion of this pipeline that crossed what's called the exclusive economic zone of the United States. It's outside state waters and the exclusive economic zone of the Bahamas. There, we were regulating under section 3 that border crossing piece of the pipeline. If you go to Shell, they'll actually discuss how there's two different Bahamas orders. There was two different proposed projects. Neither were ever actually built. The interesting thing about the Calypso order that we cite there is there's only one mention of LNG terminal in that order. It's in a footnote talking about how the LNG terminal was going to be in the Bahamas where the ships dock and they unload their LNG. Then it's going to be piped 42 miles to the US. We're exerting section 3 jurisdiction over that portion of the pipeline that's crossing the border. That would be an example of, I think it was obviously important, import facility that was crossing the border. We weren't calling a terminal. Yeah, but portions of pipeline just seems to me like it might be a different thing. You have these facilities. You say, gosh, what everyone understood LNG facility to be is this giant thing that's right on the coastline and it loads directly or unloads directly from ships. Your Honor, actually, I have to disagree with our position. It was LNG terminal. Terminal is what testimony during the hearing that they cite later in the testimony. He says the requirements of an LNG terminal are in the first requirement is deep access. We had been regulating after district gas sort of LNG facilities and that's what included the cross-border pipelines. Those were facilities when we talked about LNG terminals. I guess I didn't make that clarification earlier in my call with you. The one LNG terminal was the terminal in Alaska. There were other important export facilities that were being regulated. In terms of LNG terminal in Hackenberry, which we cite in our brief, I think at 27, it's cited in the hearing order at note 31. That case involved section three and section seven jurisdiction. We distinguished between the part of the project that had LNG ship unloading and was capable of unloading 210 tankers a year. That was the terminal, the interstate. We're just talking about LNG terminals as regulated by 3E, not whatever broader category of export facilities there might be under 3A's district gas penumbra. We're talking about can one draw an inference from history about what the term LNG terminal covers? Yes, and we think you can again because when we use the term LNG terminal, we were talking about these facilities at the coast where a ship is coming and directly offloading LNG to or from the ship. Freeport is a case that they relied on regularly and we cite also in our brief. In Freeport, they described the LNG terminal as the facilities that were receiving the LNG and the 9.6 mile pipe was actually called the send out pipeline and described in different paragraphs of the order. Yes, we approved the LNG terminal and the send out pipeline. This alternative export means of using containers, did it exist at the time? Was it popular? So I do think that there may be that the reason why everyone was thinking about facilities on the shore is not that anyone thought, oh, a quarter mile inland is completely different. It's just that was that was the only existing technology and it's sort of like a Fourth Amendment applies to wire taps point. There's a new technology and all right, so it's a little bit inland like so what? So I do think that and I believe the commission said in Shell that there were exports that were cross-border exports. I described some pipeline ones, but if you were trucking or taking something by train cross-border, we've never considered that within our jurisdiction. So Judge Cassis' question was, did that even exist when this was promulgated? You know, the Congressional Research Service reports that are cited in, I think, footnote 78 or 81 of Shell, but they're also, I think one of them is cited in their brief, do talk about exports to Mexico and Canada. They don't specify how we're exporting to Mexico and Canada in 2004 or 2009. Do you not know? I would just think as representing for if you would know that this is a technology that started in 2015. I do believe, I don't believe that the technology in terms of trucking or taking by rail, LNG or by pipeline is a technology that started in 2015. We just don't have a commission order, you know, and I asked sort of the relevant colleagues, have we ever sort of commented on this? And we didn't have one for that. But obviously there was cross-border pipelines and we were regulating things other than LNG terminals prior to 2005 or 2009. And so, you know, we have, I think, again, maybe more footnotes in Shell and more footnotes in Pivotal talking about a facility in Maine that trucks into Canada, but, you know, we didn't have a site there. I, again, reached out to people at the commission. We, you know, that facility never came to us for a declaratory order, so we didn't have a order stating when that facility started trucking things to Mexico. I looked at the Department of Energy because all of their export approvals are available online. I looked at them last night. There were a number of export approvals in the 80s that sort of specify the countries or import, I think it was mostly imports actually, but imports that specified the country you were coming from. There was, I should have printed it out and brought it with me, but, you know, coming from Minnesota and back with pipeline transfers and everything, I don't know about whether any of them specified we're going to truck or we're going to use trains to move LNG away. But again, we were referring to terminals as being these open water ports or... Council, Council, can I ask you to focus on the direct transfer test in particular? Because, history aside, we now have a statute in 2005 that you agree in your brief is very broad. It says an LNG terminal covers all natural gas facilities that receive, unload, load, store, transport, gasify, and so on. But your test seems to say that something is an LNG terminal if and only if it has a pipe that directly loads or unloads from a tanker. And I'm just really struggling with how to square that with the statutory text. So, I have to point to footnote 33 where we said we have not sort of taken a position on something that would have a pipe coming into the facility. It would then liquefy at the port and put into ISO containers and be a dedicated facility that load those containers onto the ship. Like we said, we weren't confronted with that. In terms of the pipe, you need a pipe coming in. I'm sorry, can you say that again? Because the text of your order and the rehearing order says over and over, this is not an LNG terminal because it doesn't directly transfer to an LNG tanker. Yes. And, to me, that seems to be the rule you've applied clearly distinguishes between two exactly identical facilities except that one has the pipe that goes directly onto the tanker and one has a pipe that loads into containers and they get trucked over. Or maybe even there's a crane there and it gets put on. That's the test that you apply. If I can unpack that a little bit. When we're talking about natural gas facilities, it needs to be a facility dedicated to natural gas. And so in this specific no petrol proposed facility, the trucking to a general use port, we even discussed how the crane at the general use port, that's then not part of the facility because those are general use. I was commenting that I think it's in the declaratory order and not the rehearing order. Footnote 33 talks about how we haven't taken a position on a facility that would have a pipeline coming in. It would liquefy right there at the coast. LNG tanker or not an LNG tanker, a ship would come in. It would be solely, not a general use facility, but solely for the purposes of natural gas. Instead of piping it into the ship, it piped it into a ISO container and craned it onto, we have a footnote saying. Could you please answer Judge Garcia's question? Because that's also something that I would like to know the answer to. How does your interpretation that requires an LNG terminal to directly transfer LNG onto a ship, how does that square with the statute, the structure, the context, and the intent of Congress? So directly transferring, all I meant was, we haven't said directly transfer. Could you please just answer the question? Okay, directly transfer comes from the statute's focus on onshore or in state waters and being an LNG facility. We said historically LNG facilities were facilities that, if I can quote real quick, that were connected via pipeline was one, but the relevant one was located at the point of import or export such that LNG is directly transferred to or from an ocean-going bulk carrier LNG tanker. So, you know, we thought of them being at the point of export or import, and historically the point of export or import was directly transferring onto an LNG tanker, and so that's where we get the direct transfer test. Heretofore, the direct transfer has always been by a pipeline, but we did leave room that if you, sorry. I just want to go back to clarify. The concern is that we're interpreting the words located onshore, right, and it seems to me that here we could have a facility that's located right on the coast. It does maybe four or five of the statutory, you know, activities, right? It gasifies, it liquefies, it transports, and it's on the shore, and somehow your interpretation of the word located onshore would mean that's not an LNG terminal, and I just, and it's based on whether it transfers and how it transfers to a ship. I think that's sort of the fundamental problem I see with the direct transfer test. Do you have sort of a way to connect this back to the text? So, connecting it back, the direct transfer test is about focused on locating at the point of import or export, which we deem to be the point at which you are transferring the LNG for purposes of bulk carrier facilities onto the vessel, if that makes sense. And so, if you imagine, say they couldn't get permitting or something for the Port of St. Joe. Now, Petro had said in their application, or if the Port of St. Joe was full, they might truck to Jacksonville, which I think is 200 and something miles, or Mobile, Alabama is 200 miles the other direction. You could have a facility that was located right at the coast, but was not using a nearby port, but was trucking, you know, many, many miles away. Again, we would say the trucking cuts off it being a LNG facility because you're trucking to a general use port, and that facility might be located, you know, it might be located very close to the shore or right at the shoreline, but it's not at the point of import or export, because that's that other general use port is the point of import or export. It would sort of distinguish if you built, thinking about, you know, trucking to Canada, if you built a facility on the sort of coast of Maine, or I guess in the Puget Sound might be easier, in Washington, right up against the water, but then you trucked up into British Columbia, you know, we would say the point of import or export is the truck crossing into British Columbia, and that facility is not located at the point of import or export, and so that's where we're, you know, we're thinking about LNG, again, the terminal we think does describe deep water LNG ships, but we're thinking about where is the point of import or export, and that's why for pipelines, you know, it's that stretch of the pipeline that crosses the international border. Let me try it this way. You've just said that if you have a facility loading cartons, crates, what's the, I forgot the term. ISO containers. Containers. Yeah. You have a facility locate, loading containers, it can be right on the border, or it can be anywhere, right, and once the item is loaded on the truck, that's the end of the facility, and you're not at the point of import, but let's focus on what you think is regulated. Is there something about the directness of transfer that just bakes in geography? Because I have the same concern my colleagues do on direct transfer, which is just if you think at the highest level of generality, the statute requires geographic proximity, and FERC has replaced that with some concept of direct, and that seems problematic unless there's something, you know, unless, I don't know, technologically, a direct transfer facility has to be right there at the coast. So, I think this goes to that, you know, the direct transfer is what we think of as the point of import or export, and so we've traditionally only regulated, including for the cross-border pipelines, just the point of import and export was, or import or export, sorry, was the section three jurisdiction, and the section seven jurisdiction was the interstate. But even, the facilities, the paradigm LNG export facility that you think the statute covers, right, has on the outgoing end, it has like a mini insulated pipeline, right, that affects a transfer from the facility to the specialized ship. Yes. Okay. Is there some reason why that can't be a quarter of a mile long? So, if the pipeline is still transferring directly to the ship, I think we would say, because the facility includes that pipeline, the facility is then running up to the point, sorry. If it were in Nebraska, and the pipeline ran to the ship, that would be onshore? So, it would actually be a little bit different there, because the pipeline from Nebraska to whatever the point of export or import state would be a section seven and so that would then be exempted from section three and put in section seven by the section 211. Okay. Ten miles away in the same state. So, onshore. Ten miles inland in the same state, onshore? So, I think the Freeport example or the Alaska Gas Line example is sort of talking or thinking in Freeport, the liquefaction facility was right at the shore. The inland pipeline for the intake was 9.6 miles. It was a traditional terminal right there at the shore. I suppose if did the liquefaction at the other end of the 9.6 and you had the pipe, the pipe was all going to be still part of the same facility and the facility is still going to extend to the shore, if that makes sense? So, your answer... And still going to be directly transferring at the... So, I don't want to put words in your mouth, but I think your answer has to be that, has to turn on the metaphysics of what the facility is. And if you have, you know, the facility needs to load the ship, you need a pipeline to do that, you're saying that pipeline by definition is part of the facility. And it turns out most of these things are right on shore and the pipeline is 10 feet long, but same analysis if it's a quarter of a mile long. Again, the facility has to extend to the point of import or export, which in the example you're giving me is the pipe sort of tanker at the coast. Yeah. And I guess I'm just trying to figure out, is that pipeline going out from the facility, is it more like a truck, which feels like it's just a different thing, or is it, it's just part of the facility? You know, you've got the storage tank and the pipeline, it's just an arm coming out of it. And there's something about the science or the technology that just requires you to treat that as one unit. I think it's partly because it's the same sort of facilities and things that we've traditionally regulated, the port, the coastal, the LNG tanker berth, et cetera, the takeoff pipeline, the liquefaction facilities, the storage facilities, they've all been part of a facility. And again, traditionally, when we've had applications for these, and when we've talked about an LNG terminal, again, the terminal language was for these large pipelines, you know, crossing interstate. You know, the natural gas facilities language in Section 211, that's where we draw our sort of first criteria that it needs to be dedicated to natural gas. So again, the pipeline is dedicated to natural gas. It's all part of the same natural gas facilities. They're only dedicated to natural gas. Now, Petro here broke that chain of natural gas facilities when they load these general use containers onto trucks and they truck to a general use port. We did have, I think in paragraph 12 of the declaratory order, and I can't recall the paragraph in the rehearing order, we talked about the crane, even though it's owned by no Petro, still wouldn't be a part of the natural gas facilities because it's a general use crane. So, you know, it seems to me that what FERC wants to regulate, correct me if I'm wrong, is safety. And what's happening at these facilities is they're, I guess, cryogenically freezing the natural gas to make it liquid. It has to get to whatever, 260 degrees below Fahrenheit, whatever it is. And it seems to me, why does it matter where the facility is, if the purpose of this regulation is to promote safety? So I think the purpose of the Section 3E addition was to make clear that FERC was going to be regulating the siting, construction, and operation of these facilities. As compared to states, there was obviously a dispute between California and FERC going on at the time about a proposed LNG terminal in the Port of Long Beach. And by all accounts, it seemed that FERC wanted standards that apply everywhere. They didn't want different states doing this on their own, and different states have different capabilities and experience in regulating something like this. And so I'm just trying to understand why it is that FERC doesn't want to regulate these facilities unless they're right on the coastline, because it seems to me it's a matter of function, not location, if your goal is safety. So I think we've traditionally interpreted Section 3 similar to how we interpret Section 7, and taken the view that, you know, you needed to be an importer, like, at the point of import. But why? I guess you keep going to, it's our tradition, but I'm trying to understand, but why? We understood that the Congress's purpose when it initially drafted the Natural Gas Act to be included the facilities. It was district gas. I think Judge Garcia, during the petitioner's call, noted that it was district gas where this court sort of informed us that Section 3A covered more than just the actual import or export of the gas. So, you know, our earlier reading of the statute was that it was focused on pipeline transportation for Section 7. It was focused on the actual import-export sales, rates, terms, things like that. And so I'm not sure that we've even after district gas is being focused on safety as much as it's focused on, we're the party that regulates, you know, terms and conditions. And some of these, when they're not asking for a declaratory order for import-export, but they're asking for, you know, certain rates if they're importing, that they're going to be selling into the market and other things like that. But you're charged with regulating site and construction, etc. That's not rates. That seems, it seems to me that, correct me if I'm wrong, that doesn't that all go to safety? Like, why else would you have to regulate site and construction and how these things are run? I think safety would be one concern, you know, environmental interests, regional interests. We've traditionally similarly regulated kind of siting of pipelines in the Section 7 situation. So my question is, why does that depend on where it is, whether it's a quarter of a mile from the shore or five feet from the shore? Why does it think that the statute used onshore and LNG terminal to talk about these deepwater, or not, I shouldn't, to talk about these sort of bulk tanker facilities. And we traditionally treated our export and import jurisdiction, even after district gas, as focused on the point of export import, which was that kind of point of crossing a border, point of crossing an economic exclusionary zone. Let me try it this way. It seems like the practical effect of what you're doing is to draw a regulatory distinction between facilities that are loading specialized tankers through an outgoing pipe and facilities that are treating those two categories differently. So the general use containers or general use cargo ships, I think, is what you're asking me. You know, we've always viewed general use facilities as outside of our jurisdiction, because natural gas facilities meant things that were specifically dedicated to the import and export. And so that's where the important the point. And so we need the point of import and export to have dedicated natural gas facilities. And so that's where the pipe that loads onto an LNG tanker ship is the point of import and export. All it's doing is natural gas. Sorry? All it's doing is natural gas. The truck that carries these cartons, can it just be any old truck and all the technologies in the carton doing the insulating, or do you need a special kind of truck to carry LNG? Well, so for purposes of this project, they're carrying LNG in these ISO, International Container Organization. Those containers can carry other things. A colleague said, like, orange juice is something that they often want to cool when they're trucking that they would carry in the trucks. The trucks could carry. Yes. So if you cleaned it out after you had natural gas, you could have something different in that container. To your specific question, I assume that there's some sort of ISO container carrying truck. So it might be different than a general flatbed, but it's the truck or the container can accommodate natural gas or orange juice or something else that needs to be kept cool and is in a liquid state there. So yes, I guess we and so we don't view those trucks as dedicated natural gas facilities. And so that kind of breaks the chain of what is the facility we're talking about with respect to flows from your dedication requirement. But you linked it to onshore, which is the geographic requirement. Yeah, I think again, I think our three criteria come from natural gas facilities located onshore in state waters, transported sort of the waterborne aspect of the onshore there. And also from our use of LNG terminal, which, again, is traditionally these bulk carrier facilities are what we call terminals. In the congressional testimony, we described you needing ability for these large tanker berths. The point of import or export is, you know, we demarcate that and we didn't decide to have some sort of geographical proximity to the point of import or export. We looked at our traditional practice. We looked at what we'd seen before and thought the point of import or export is where you're directly transferring something to the foreign country in the case of a pipeline or to the tanker. In the case of these LNG terminals, we had seen. It seems to me that you're relying a lot on your traditional practice or what you've always thought, but we have a statute here that is really inconsistent with your traditional practice. And the statute has to control, right? Yeah, I'm not sure that, or I guess we don't think the statute's inconsistent. Well, where in the statute does it say it's deep ports? It says all natural gas facilities  and where does it say at the point of import or export? It says that is imported. Doesn't say at the point of import or export. None of that is what the way you've construed the statute is at odds with what the statutory language says. You know, I think we think that natural gas facilities that do these functions for gas imported into the United States or exported from, you know, again, you're right. We're construing against our traditional understanding of what section is doing. Correct. I'm suggesting to you that your traditional understanding, to the extent it conflicts with the statute, the statute has to control. And I'm asking you to point out where in the statute it says that it has to be next to the water and it has to be one of these deep port, big natural gas terminal things that you're thinking of. And where does it say that it has to be at the point of export? So obviously we think that the statute's ambiguous and it's broad. And we think Congress was legislating against. Where's the ambiguity? Onshore, again, as meaning at the shore, it can also mean coming towards the shore, like an onshore wind is a wind coming from the ocean to the shore. It can be located on land. So we think that onshore is broadly ambiguous. We do think that in using the term LNG terminal in the legislative history, talking about these coastal facilities and LNG tankers, Congress was intending to legislate against our regulatory backdrop. And so we think that the broad, ambiguous language of the statute was not meant to displace our traditional understanding to legislate in light of our traditional understanding. Again, that's, they didn't, you know, they used LNG terminal, which was a term we had used in prior orders describing these coastal facilities that had large tankers. They didn't use, you know, all the export facilities. They used a completely different definition of LNG terminal than your traditional understanding. And it doesn't say at the point of import or export. Where is that ambiguous? No, it didn't. I think, and I believe this is covered in Shell or in Pivotal, but we had traditionally thought of the point of import or export versus the interstate commerce as being the line between section three and section- We're back to tradition, and I'm looking at that story. Okay. Well, I was going to point to, you know, in section 211B, they excluded any pipeline or storage facility subject to our section seven jurisdiction. And so we thought that was an They were still thinking about the distinction that we have traditionally drawn between section seven jurisdiction and section three jurisdiction. You know, that was an issue in other cases about intrastate transit or about where the section seven regulations came versus section three. But we did think when they exempted the section seven, they were sort of thinking of our traditional line between section three and section seven. Thank you. Thank you. May it please the court, I am Jennifer Key. I am representing the intervener, Nopetro LNG LLC. And I'm here just appearing to reinforce the position that my client does not view the case as moot. What can you tell us about your client's intentions? I can tell that they currently, they do not have plans to move forward with this project at this time. We've abandoned the idea completely at this port or any other port that has a, you know, a suitable facility, a suitable area nearby where we might engage in this activity. For how long does the declaratory order protect you if you want to begin construction? I mean, I view it as it protects us until another commission comes and changes the policy. So for indefinitely? Indefinitely. You would build the plant if the price of natural gas goes up. Yeah. And we need to find the right off taker and the price, you know, definitely the price of natural gas, I think has an impact here. But we definitely think the standard generally used of the issue arising again has to be, you know, too remote and too speculative to not occur again. We don't think that standard of too remote or too speculative has been met. And the other often used speculative that it's absolutely clear that the behavior which. As to your client's intentions, I imagine what you just said probably describes any number of potential projects they might have in the pipeline, right? We, you know, we've got our list of 20 projects we might do someday, maybe. And this project is now back in that bucket. If, you know, the price of natural gas goes up and other conditions are favorable, is that essentially what you're telling us? I don't think I will. I'd say it's more than just the price of gas. I think there's other market concerns other than the price of gas. But that basically the reason they're looking to export and particularly, I can tell you this much, you know, areas they were looking to export to were generally not too far from Miami, the Yucatan, Belize, those areas where they do have trouble with, you know, to produce electricity. Natural gas can be used such that, you know, there are entities down there that if the right, you know, if the right project was built in one of those areas that needed natural gas, you know, that they would be interested. And specifically relating to the port at St. Joe, there is a piece of land that the project was going to go on is contaminated and it's highly contaminated such that it should be available to our client because there's almost nothing else that can go there. So when we talk about, you know, if a customer came along for the product, we fully expect that we could, we don't currently have, I think, an option to lease that piece of land, but that piece of land can basically be used for very few other things. Thank you. Appreciate your goodness. Rebuttal? Yeah, I would like to make a couple of points about mootness and then a few points on the merits. First, the commission says it decides these things on a case-by-case basis. I think as you pointed out, it really has, it doesn't apply a facts and circumstances test. It has a pretty definitive ruling about truck transport being outside of its jurisdiction. It also mentions, the commission mentions that a citizen could seek a declaratory ruling if Petro decides to start up this project again. To my knowledge, there's no timing requirement on a declaratory ruling. The commission could sit on it and build its plan. And by then the case would be moot. On the merits, the commission spent a lot of time on the term LNG terminal and its historical understanding. It is not a term of art. It's a defined term in the statute. The question is, what does that definition mean? I think nothing, almost nothing in the commission's order really parses out the word LNG terminal. It's about what the meaning of onshore is. The other point I would like to make on LNG terminal, although the commission mentions large facilities that directly transfers LNG onto tankers, the new fortress decision that this court decided last year involved a completely different type of facility. There was a chain of transfers onto the dock, onto a floating storage unit that then used a small hose to transfer the LNG onshore. And the commission said, we're not going to let you circumvent our jurisdiction through innovative designs. So I think that's completely inconsistent with commission's position that it looks to its understanding of what LNG terminals look like. In terms of the statutory definition, I'll just point out liquefaction facilities, gasification facilities, they'll never be located at the point of export because they have to be connected to the ship in some way, either by truck. It's the type of truck that will be located at the point of export. And finally, as to the commission's emphasis on point of export, that's not a permissible definition of the term. The plausible universe of interpretations are on land or near the coast, not near the point of export. I think that cabins the commission's authority altogether. The court has no further questions. Thank you. Thanks to all counsel. The case is submitted.
judges: Katsas, Pan, Garcia